Next case is number 2010-1141, Emory Glatt Air Techniques, Incorporated. Mr. Kennedy. Thank you, Your Honor. May it please the Court, I'm Charles Kennedy. I represent the appellant, Glatt Air Techniques. This case proceeds from a re-examination proceeding from the Board of Appeals. We request that the Court reverse the Board of Appeals because the reference that the Board of Appeals relied upon, the Nounapper reference, does not have any structure or capability of protecting the initial spray pattern in the spray. Would it be fair to characterize the claimed invention as one that proactively, or the proposed claimed invention as one that proactively prevents these globs from forming and as one that responsively corrects after there already is a problem? Is that the way you would characterize the two different references? I would, Your Honor. I think, in fact, the Nounapper reference is an indication of the very problem that the inventor was working with. Nounapper is how to solve a problem after it occurs, and the claims that you seek are how to prevent it from occurring. That's exactly the case. And so it's your view that there's no shielding means at all in NAPPER, or is that there's a shielding means that operates in a different way? Our position is, Your Honor, I think if you look at Nounapper, it has no shielding means. And in particular, it does not shield the initial spray pattern in the update. That's what one has to look at. But I think we can just move straight to the Nounapper reference, and that's Figure 5. We set that forth in the reply brief at page 12. I'm sorry, in the reply brief at page 13, and in the main brief at page 9. Because the director and the board are focusing only on, they say the only disclosure in Nounapper is the right side portion of that. Nounapper has three nozzles. And if you look at the right side nozzle, what you have there is precisely what's been pointed out already. The problem that the inventor was dealing with was if the particles can get into the initial spray, that's where the spray is the wettest. And what he found out is the particles would then stick together, and it would cause agglomeration problems. These are sprayers where the particles pass numerous times through the spray. They get stuck together, they block the system up. So he devised a means for preventing the particles from getting into the initial spray. They get into the spray later, where they won't stick together. But it seems that what really seemed to be concerning the office, after all, was the breadth of your claim file. They allowed the more restricted claims. They said, well, this can read on a wall of air as well. And that they were concerned that you were claiming more broadly than you needed to, and perhaps than you had supported. Your Honor, first of all, even if the claim were read as broadly as to say that it was any means for shielding the initial spray pattern, NAMRFR doesn't have that. But getting to the question of, of course, because this is means plus function language, and it has to be properly construed. To look to the structures described in the patent as performing this function, and then the equivalence of those. And we're not reading it so broadly. In fact, we think the board improbably read it to just include any structure. The board says explicitly, it would be any structure, regardless of whether or not they're described in the patent, as long as you perform the function. We don't contend it's that broad. We look into the patent, the patent does describe a structure, namely a sleeve, which would go around the nozzle where you have air coming up the sleeve. It delivers air at the initial spray pattern to keep the particles out of that initial spray pattern. And I think, thirdly, what we do know, though, is when you construe the means plus function language, what it absolutely cannot cover is a structure where you have a hose below the base or in the screen, which is delivering air upwardly, because that is not disposed as a structure in the patent. Well, but that's why this is an obviousness rejection and not an anticipation rejection, I think, would be the PTO's argument. Can you show me what, though, in Figure 5 is missing in terms of the 112.6 language? The foreshielding, the initial spray pattern, why isn't that shown on Figure 5? Tell me what you're looking at that demonstrates that it's not shown. And I think it's useful to compare that to Figure 1, if you would do that, Your Honor, because Figure 5 of Nounoper is different in two significant regards. First of all- From Figure 1 of your- Of the patent in suit, Your Honor. I would just use that as sort of a comparative reference. But Figure 5 of Nounoper is different from what is claimed by Claim 5 in one significant regard in particular, which is the nozzle. You see Nozzle 5 in Figure 5. That is in the screen, which runs- That's in the what? In the screen. In the screen. The screen, which is this element. I don't think it's designated there. It's the bottom of the container. Oh, I see. Underneath. You mean it's underneath the parallels, the- When you say Number 5, you mean it's contained within that tube below? Is that what you're talking about? Yes, Your Honor. Well, let me try to explain- It doesn't protrude up. It's contained below. That's correct, Your Honor. If you looked at Figure 1, in comparison, you see the screen of Figure 1 is element- I guess it's designated as 18, which is also this parallel, this line. I'm looking at Figure 1 of yours, and I thought you were talking about element 32, the nozzle. Is that what you're talking about? Yes, that's correct, Your Honor. Where is the figure- I'm sorry. On Page 12, is that Figure 1 that you- Figure 1 of our patent is the brief at Page 7, Your Honor. I'm flipping back in the blue brief between Page 7 and Page 9. Okay. That's correct. What you have is, in Nalipur, the nozzle is in the screen. You'll see the spray projecting from Nozzle 5 in the screen of Nalipur Figure 5. Yes. However, Claim 5 defines the up bed as being the area within that cylinder, Number 4, still dealing with Nalipur. And it requires a shielding of the initial spray pattern against- But where is the- it must be in the upper bed limitation within Claim 5. Tell me exactly what language you're referring to. Most of the language, Your Honor. It talks about the cylindrical partition, which is Number 4 in Nalipur, defining an inner up bed. And it's the interior of that partition that's the inner up bed. But then, even more importantly, the shielding means is said to shield the spray pattern developed by the nozzle against the entrance of particles moving upwardly through the up bed. So the shielding of the initial spray pattern has to occur in the up bed. Well, where is the up bed in Figure 5? Isn't it just everything above that line that goes across? No. Isn't the up bed everything above it? Or are you telling me the up bed is only Number 4? What is the up bed in Figure 5? The up bed is only within the cylinder. So only Number 4? Yes. I think it's actually designated as 14 above there. Oh, okay. It's the area within that cylinder. Fine. See, so you have in Nalipur, you have a situation. It's a different construction. So wait, just let me make, I'm trying to make sure I understand. So is your argument that there is a portion of the spray which comes out of Number 5, that nozzle, and goes into Number 14, but before it goes into Number 14, it is unshielded in that lower area? Is that your argument? No, it isn't, Your Honor. Okay, and I'm not being very clear, I guess. But for Figure 5 of Nalipur, in order to make what we have for Claim 5, you have to move that nozzle up into the up bed like it's shown in Figure 1. Well, I understood that part, but you were saying there was something else about the spray that was different, and so I'm trying to understand that second argument. All right. I think my point was, Your Honor, that there is no way that this construction of Nalipur can protect the initial spray pattern, because what they're arguing is the air coming up from Pipe 9, the purpose of that air is to create the up bed, in other words, to make the particles go upwardly through the middle of the cylinder. So they then go out the top and they drift down on the outside, and then they're rotated in that fashion. That's how this system works. And the point was that that air spray can't do two functions. It can't both take the particles that are coming down and train them and move them up through the up bed so they go into the spray, and at the same time shield them from entering the initial spray. See, and my point was that if you move the nozzle up, if you move the nozzle up, you can see from the left side, let us say, of Figure 5, that the particles are being moved. When they are moved into the up bed, into that cylinder, they're being moved right into the cylinder, so that if the initial spray were in that area, they would be moved right into the initial spray. That's why you get evaporation in this system. Well, we'll hear more from the office, but still coming back to the question, it seems to me that they weren't concerned with what you were providing and what you had taught. They were concerned with the way it was claimed in this particular claim. Again, because they said that the prior art provided an air wall, and your claims read on an air wall. Yes, Your Honor, and that's what I'm trying to show. From now on for Figure 5, it does not provide a shielding means to shield the initial spray pattern. That's precisely their argument, and that you haven't distinguished that. That's right, Your Honor, but all Down Upper Figure, this Figure does, Figure 5 does, is it shoots air out of Number 9 to fill up the up bed. It's not got, if you look at what we have in Figure 1, it actually shows that around the nozzle, not within the entire up bed, but around the nozzle, there is a shielding means that keeps those particles, when they're in the up bed, from going into the initial spray pattern. That's the difference. We're not relying on what we have in this case. So what does an upper do? How does it achieve the result? It achieves the result by the gas flows and blows it out of there? Your Honor, an upper doesn't shield. It achieves its result by blowing blockages out. It lets blockages occur, and then it blows them out. So is air continuously being pumped in Down Upper at all times, or is it only when there is a blockage air is pumped through? It's pumped at all times. See the up bed. The air is circulated in Down Upper by shooting the higher speed air, as it is in the independent invention, up the up bed, to get those particles moving through the center of the cylinder, and then they drift down the outside of the cylinder. I guess if air is going in all the time, I don't understand how a blockage would form. I really thought that Down Upper involved bursts of air that were to clear blockages. Am I not remembering it right? No, you are, Your Honor. That's the right side of Down Upper. You see this valve 13 is open full. That's what happens there. But when Down Upper is in normal operation, it has nothing to keep those particles from going to the initial spray pattern. All that's happening from this pipe 9 is it's creating the up bed. It's creating this sort of two-flow system, which is going at all times, where the air is being forced up, and then it drifts down. I see I'm into my report. Let's hear from the office. Ms. Lynch. Good morning. May it please the Court. I want to start first with the claim of construction, as you mentioned, Judge Newman. The USPTO is required to give Blatt's claims their broadest reasonable interpretation consistent with the specification. And the USPTO did that here. And I'd like to send you to Blatt's patent at A21, column 5, beginning at line 3. And what it says is that Where would I find this? Where in the appendix are you reading from? I'm sorry? Where in the appendix are you reading from? I'm sorry. Find wherever you are. A21. Okay. Column 5, line 3. And so it says, In addition, although the shielding of the spray nozzle is preferably provided by an inner cylindrical partition 40, other shielding arrangements may be utilized. For example, shielding of the spray nozzle may be accomplished by formation of an air wall or stream that surrounds the nozzle and prevents particles from prematurely entering into the spray pattern. So in light of Blatt's disclosure, the Board properly gave Claim 5 the broadest reasonable construction and determined that shielding could be done preferably by an inner cylindrical partition 40, but also alternatively by an air wall or air stream. Okay. Well, if we accept that, can we go to Figure 5 of Knapper? Yes. What is the government's position on what we're supposed to look at there? Okay. In the Knapper's disclosure, where they describe what's going on in Figure 5, that's on A89. And what they say, and I think Blatt tries to read Figure 5 too narrowly because they don't take into account its disclosure. There's a valve 13 on both sides of Figure 5. Do you see that? Right. And on the right-hand side, the valve is open. And according to Knapper, that allows you to regulate the air. Now, Blatt tries to say that that's only when there's a complete blockage. But Knapper's disclosure is actually broader than that. And on A86, it says disruptions that arise during the process can be registered even at the starting stage. So as soon as the particles start to slow down, there's a sensor, and that allows this valve to open. And at that point, you can give increased air. It's not just to block, to unblock clogs. Ms. Lynchfield, let me take you back to where we started in terms of this broadest reasonable interpretation. Claim 5 says a substantially cylindrical partition. Are you telling us that it is reasonable for the office to read that specific partition term in light of the specification, which says maybe in my invention you don't have to have a partition. You could do it some other way. How can that be a reasonable interpretation of the claim that was initially granted by the office? There's a little bit of a confusion here, Your Honor, because there's two substantially cylindrical partitions. So the one in Claim 5 in the preamble is talking about cylindrical partition 22, which just defines the up-bed from the in-bed. But the inner cylindrical partition 40 is Glatt's preferred embodiment. If you can see that in Figure 1 of the patent, that surrounds the nozzle. And where is that manifested in Claim 5? Claim 5 doesn't specifically disclose the inner cylindrical partition 40. Instead, it discloses the shielding means. Well, if that's not an issue in Claim 5, then I don't understand why Claim 5 was rejected on this interpretation plucked from the specification. So what the Board did was when it read Claim 5, and in light of its specification, it found that the shielding means was broad enough to include an inner cylindrical partition 40 as well as an air wall or air stream. Without any partition at all? Without inner partition 40. And you're telling us that that's reasonable? The Board looked at the specification and relied on that disclosure. Well, that wasn't what I asked you. It's our position that it is a reasonable interpretation in light of the specification. And then the Board went to Nell Nopper and found that Nell Nopper also had a point. But Nell Nopper, the section of Nell Nopper you pointed to at A86 is talking about disruptions that arise during the process, even at the starting stage. I imagine that would be, for example, when stuff is already globbed on because you used it at some other point or something. I mean, it's disruptions. Nell Nopper, it seems to me, envisions disruptions. It blasts up air to cure problems. Now, maybe they occur at the starting point. Maybe they occur midway through. But it isn't disclosing a continuous wall of air to be used as a shield. I agree, Your Honor. It's not a continuous wall, but it does disclose that you can use an air wall or air stream during the process. Glatt tries to say that it's only when the process is completely broken down. And I think Nell Nopper disagrees. So where is the air wall in Nopper? So what would happen is when this valve, if we're back on figure 5 on A71, when you open valve 13, that allows air to burst through and go up this pipe and go into the up bed. And so what's the air wall? The air wall would be the air wall or air stream that would come out of the pipe, and it's our position that that would shield the spray pattern. Where is the shield? I guess I'm having a hard time seeing the shielding going on. When you look at the right, the particles are already inside, right? So it would have to shield the spray pattern coming out of the nozzle. So it's shielding it so that the particles don't get in this area? But the particles are in this area, at least on the right hand, and it looks like on the left in the middle a little as well. Right. It would keep the particles away from the initial spray of the nozzle. But it's not doing that in the figure 5, is it? Well, if you look at figure 5, it shows only a few particles around the initial spray, whereas there's many more in the left and middle sprayer. So it is keeping particles away from the spray. How do you know that's the initial spray? It's the spray pattern of the nozzle. The initial spray, it's not defined exactly what's initial, but the board also found that it would be obvious to one of ordinary skill in the art to move the nozzle up so that it would extend into the uphead. What are the differences between the three, each labeled 14? You're suggesting that the one on the far right demonstrates an air wall. Are you agreeing that the other two do not? In the other two, valve 13 is mostly closed, so it's not forming the air wall or air stream. It's in the right side where you can open the valve. And what the disclosure says is you can open this valve and you can get intensified air, and it's not just to blow through and disrupt blockages, but it's also to manipulate the actual treatment of the tablets. So like I was saying, a disruption can just be a slight slowing of the fluidized bed. You can then intensify the air to get rid of that slope by forming an air wall or air stream around the nozzle. Can I ask you to address the board's position on the secondary considerations? I'll tell you what I seem to witness here. You have an examiner who rejects and refuses to consider secondary considerations because he said they're not commensurate in scope, a concept that I don't understand. Then you have a board opinion that says nothing about commensurate in scope, but rather on page 24 of the board opinion they instead talk about we're going to reject the evidence of secondary considerations entirely because they're not related to what we think is the closest prior art noun apper, as opposed to this being a Jepson claim, what's disclosed. Then you have the solicitor going back and defending the examiner's commensurate in scope argument and not even speaking at all about the board's decision and what the reason it rejected secondary considerations. So I guess what I'm trying to understand is within the office you have two completely different reasons for why it's being rejected. One at the board level, which you don't defend on appeal. One that you defend on appeal, which isn't mentioned in the board decision. And so I would like you to explain to me which of these the government is arguing is the reason that the secondary considerations should not be considered. Okay, Your Honor. I think I laid it all out for you pretty clearly. You did. Okay. All right. So if you look in the board opinion, they cite case law, A11 to A12, saying, in addition, the scope of the objective evidence, if non-obvious, must be commensurate in scope with the claims which the evidence... Where are you exactly? It's the last sentence of A11 that carries over to A12. That seems to me a general statement. It doesn't seem that they've found it's not commensurate in scope. And then if you look at A14, that last paragraph that carries over to A15, and if you go down to the last sentence beginning on A14, it says, here the examiner correctly found the relied-upon evidence unpersuasive because it did not include a comparison of the claimed invention against NANOPR, which teaches a shielding arrangement consistent with the 503 specification. And then it says, because no evidence demonstrates any unexpected result or commercial success based on the actual difference between the claimed invention as broadly recited and NANOPR's apparatus of appellant's argument fails. So if you go and you look at what the examiner did, and this is at A... Hold on. Before we go look at what the examiner did, how am I supposed to construe the board opinion as concluding that the evidence of secondary considerations did not establish commensurate in scope? The portion you just read to me very clearly says the reason they reject secondary consideration evidence is because it wasn't measured against NANOPR, the correct prior art in their mind. It says, Your Honor, the actual difference between the claimed invention as broadly recited and NANOPR's apparatus, and the claimed invention as broadly recited includes the air wall or air stream. And so what it's saying, and if you go to what the examiner explained, he basically was saying because the claim is broad enough to include an air wall or air stream... And this is what you've defended on appeal as well, and I'll tell you what troubles me about it. You want the commercial success evidence to be, quote, commensurate in scope with the scope of the invention. Well, this is a means plus function claim. And as a result, you look at the structure, rightly so, as you pointed out to us, and rightly so, the structure includes a multitude of possibilities that could serve the function of shielding. Well, how in the world is this inventor supposed to have commercial success evidence of a single invention that has a shield as an air wall, a shield as a cylindrical partition, a shield? That's nonsensical. I mean, you can't have a single invention that includes every single different embodiment that's encapsulated under 112, otherwise just reject commercial success evidence as irrelevant. Because under that logic, there would never be commercial success of any patent that covered more than one embodiment, any claim. But, Your Honor, Blatt chose to claim the way they wanted to claim. In Claim 8, they chose to limit it. And you're asking us to adapt a rule of law, which I've never seen anywhere, that commercial success evidence must be commensurate in scope with the claim. He has commercial success evidence of a single embodiment that clearly falls within the claims, his commercial invention. He also has commercial success, this is a Jepson claim, for goodness sakes, how the preamble doesn't represent the closest prior art is a baffling concept. But he has commercial success evidence of the preamble. Why shouldn't the office consider that? What are you so afraid of? The office did consider it, Your Honor, and granted Claim 8, which is limited to his physical partition. But you said you wouldn't consider it with regard to Claim 5. It's not that we wouldn't consider it, Your Honor. The board and the examiner did consider it, but they found that it wasn't commensurate. And so, therefore, you wouldn't consider it. You wouldn't give it any weight. But why does it have to be commensurate? You have a claim that covers a multitude of embodiments. Suppose this was a range claim. Suppose this claim said, and you could have molybdenum in a range of 0.1 to 0.9 percent. Would you be arguing that commercial success evidence of the patentee's 0.5 percent molybdenum device would not be considered by the board because it didn't include the entire range of 0.1 to 0.9? I think, in that instance, Your Honor, the board would consider it as it considered it here, and then it would decide whether or not it was reasonably commensurate. I think that's what your case law would be. But we were so curious as well. And that is that the office, in fact, I suppose neither side, discussed a precedent which plainly says that if the thing which is commercially successful is that which is patented, that that is evidence of commercial success. And here there was no question in the testimony that the public, the consuming public, was willing to pay a very high premium for the patented product as compared with this purveyor's prior product. It was their own patent, their own invention that was being cited against them. And it's very hard to put that together with this curious position of the office that, you know, don't bother us with facts. People need to buy things upon going through the patent and say, oh, this aspect and this aspect and this aspect is why I bought this improved product rather than the product itself. Your Honor, I think our position is that Claim 5, as the office read it, is very broad. The evidence that he gave is not reasonably broad. Well, that's the position I was hoping you would present in this argument, that the claim is too broad rather than whatever else you're telling us. Well, the claim as the office read it, which we're required to give it the broadest reasonable construction, we did so. When we do so, we find that his evidence is not commensurate. Do you understand that you're asking us to adopt a rule of law wherein he could never, ever introduce any evidence of commercial success? Because what device would have the redundancy of having a shield and an air wall both doing the shielding function? You're asking us to adopt a rule of law that any time a claim covers more than a single embodiment, a single point in a range, there can be no evidence of secondary consideration introduced. I think what the examiner's answer said, Your Honor, was instead he could have done a separate comparison to show unexpected results using an air wall or an airstream against him. Then you're saying every claim has to cover only one embodiment and no claim could cover multiple embodiments and have commercial success. I just don't understand the proposition. Okay. Anything else for Ms. Lynch? Thank you, Ms. Lynch. Mr. Kennedy, we've restored your rebuttal time if you need it. Thank you, Your Honor. Your Honor, I think I want to go back to, I think that the secondary considerations evidence, which was very, very compelling in this case because we showed in the papers a comparison to actually the preamble prior art where they doubled the spray rates. It led to commercial success of $39 million in sales of this product. I think that was compelling, and it should not have been rejected simply out of hand. But I want to go back really to Nounoper Figure 5 and what that shows because I think we're down to this, which is that the blast of air is not what Claim 5 calls for in terms of, and I'll read the language of Claim 5. Shielding means positioned adjacent said spray nozzle for shielding the initial spray pattern developed by said nozzle against the entrance of particles moving upwardly through the up bed. Now, that's not what Figure 5, the right side, is doing. What that's doing is you have a blockage in the up bed, and it's simply ejecting the blockage. And the reason why it can do this is because it has the opening, or it has this pipe 9, that is configured at about the same diameter as the up bed itself. So it can generate this big burst of air that will clear the entire up bed. It's not directed to the center of the up bed. Is this figure showing a blockage? Are you suggesting that all of those little dots in the middle of the cylinder of the up bed are a blockage that it's in the process of clearing? They are. That's exactly what this is talking about. And the system is basically shut down because the particles aren't going anywhere. They're blocked there. And all this does is open the valve full, give a burst of air, and push it out of the up bed. So what's happening in the left and the middle? What's happening on the left and the middle is the normal processing, which is the up bed is taking the particles into the center of the up bed. And there's nothing shielding them from the initial spray pattern if the nozzle's moved up there so the initial spray pattern's in the up bed like it is in coin pop. That's the difference, and that's why this entirety actually shows the patented invention very well. I mean, it shows the problem the inventor was dealing with, is that you get agglomeration if you have nothing to shield. So that even construing this claim as broadly as the office has construed it, which is to say any shielding means we will take, Nauhert does not have a shielding means to shield the initial spray pattern against the entrance of particles. All that's doing is blowing air into the up bed. If you increase the amount of air being blown into the up bed, it just moves particles through quicker, but it doesn't keep them away. What I would focus on is actually figure one is showing it has an up bed confined by cylinder 22, and that's where the difference comes in. And yet you see around the initial spray there's this further cylinder, the cylinder 40, and within cylinder 40 there's air which doesn't have particles in it coming up. You see it designated by those arrows going out. That is showing how you protect the initial spray pattern from having the particles enter it. If you compare that to Nauhert for figure five, it has no protection for the initial spray pattern whatsoever. Now, I know there's been a lot of discussion about how broadly you can construe this means plus function language. The office is bound under Henry Donaldson by section 112 paragraph 6 to the same extent. They cannot simply say it's any means. You've got to find a described means, a means described in the patent. Well, they found a few words in the patent. Perhaps they were a bit of attorney expansion, which did say that you don't have to have a specific cylindrical container. Your Honor, the words they found in the patent were words that referred to an air wall but not to a structure. It doesn't say what describes a structure. You go back in this patent. Actually, it's earlier in the patent. It describes what kind of structure provides. You're saying an air wall is not a structure, but it's presented in the same sentence, which discusses alternative boundaries for that inner operation of the device. Your Honor, I think we would have to look to the patent to find the structure that creates the air wall. I don't think the air wall in and of itself, an air wall around the nozzle, is a structure. For instance, if you look at claims like- So you're talking about the term shielding arrangements? So they need a shielding arrangement? Is that a structure? Oh, I'm sorry. Is that a structure, a shielding arrangement? Yes, but I think it would have to define a structure. It's been defined as a sleeve in this patent. It's been described. That would be a structure. There's also talk about a deflector. But that one sentence, taken in isolation, doesn't describe any particular structure. I think at the bottom of the analysis on the issue about the structure, what we do know is that the patent nowhere describes a structure where you would have a pipe under the screen, which creates the up deck, which is what pipe 9 does. And that being a structure, that shields the initial spray pattern. And the reason I say that is that if you look at figure 1, under the up deck, there are openings. And within the patent, it designates it. I think it's at, I don't know, I have this reference, but it speaks of under the up deck, you have large openings, 20. And they're larger under the up deck, in the screen, so that you get the high speed of air going into the up deck. All right. I'm sorry. That's not an issue. I think we have the positions of both of them. Thank you, Mr. Kennedy and Ms. Lynch. The case is taken into submission.